**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | |
|---|---|
| **MELISSA J.[1],** | ) |
| | ) |
|        **Plaintiff,** | ) |
| | ) |
| **v.** | )     **Civil Action No. 7:20cv328** |
| | ) |
| **KILOLO KIJAKAZI,[2]** | ) |
| **Acting Commissioner of Social Security,** | ) |
| | ) |
|        **Defendant.** | ) |

## REPORT AND RECOMMENDATION

Plaintiff Melissa J. ("Melissa") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding her not disabled and therefore ineligible for disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433. Melissa alleges that the Administrative Law Judge ("ALJ") erred by failing to properly: (1) weigh the opinion of her treating physician, (2) determine her RFC using a function-by-function analysis, and (3) assess her allegations regarding her symptoms.

I conclude that substantial evidence supports the Commissioner's decision in all respects. Accordingly, I **RECOMMEND GRANTING** the Commissioner's Motion for Summary Judgment (Dkt. 15) and **DENYING** Melissa's Motion for Summary Judgment (Dkt. 11).

## STANDARD OF REVIEW

This court limits its review to a determination of whether substantial evidence supports

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.

[2] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi is hereby substituted for Andrew Saul as the defendant in this case.

the Commissioner's conclusion that Melissa failed to demonstrate that she was disabled under the Act.[3] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted); see also Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (emphasizing that the standard for substantial evidence "is not high"). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." Mastro, 270 F.3d at 176 (quoting Craig v. Chater, 76 F.3d at 589). Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## CLAIM HISTORY

Melissa filed for DIB in March 2016 claiming her disability began on July 1, 2012, due to multiple sclerosis, Lyme disease, mold toxicity, vertigo, chronic headaches, chronic nausea, near syncopal episodes, depression, anxiety with panic attacks, and all over body nerve pain. R. 259–60, 277–78. Melissa's date last insured was December 31, 2017; thus, she must show that her

---

[3] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Case 7:20-cv-00328-MFU-RSB    Document 21    Filed 08/02/21    Page 3 of 23
Pageid#: 1127

disability began on or before this date and existed for twelve continuous months to receive DIB. R. 17, 274; 42 U.S.C. §§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a). The state agency denied Melissa's applications at the initial and reconsideration levels of administrative review. R. 112, 126. On September 19, 2018, ALJ Thomas Erwin held a hearing to consider Melissa's claim for DIB. R. 61–98. Counsel represented Melissa at the hearing, which included testimony from vocational expert Asheley Wells. R. 15. The ALJ requested interrogatories from an independent medical expert after this hearing. Melissa then requested a supplemental hearing. Id. The ALJ held a supplemental hearing on May 8, 2019. Counsel represented Melissa at the hearing, which included testimony from vocational expert Mark Halman. R. 40–60. On May 24, 2019, the ALJ entered his decision analyzing Melissa's claims under the familiar five-step process[4] and denying her claim for benefits. R. 15–32.

The ALJ found that Melissa was insured at the time of the alleged disability onset and that she suffered from the severe impairments of multiple sclerosis, Lyme's disease, hypothyroidism, right shoulder degenerative joint disease, status-post rotator cuff repair, cervical spine spondylosis, and headaches. R. 17. The ALJ determined that these impairments, either individually or in combination did not meet or medically equal a listed impairment. R. 20. The ALJ specifically considered listing 1.02 (major joint dysfunction), 1.04 (disorders of the spine), and 11.09 (multiple sclerosis). R. 21. The ALJ found that regarding her mental impairments,

---

[4] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R.§ 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies.  42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

Melissa had mild limitations in understanding, remembering, and applying information and no limitation in interacting with others or adapting or managing oneself. R. 18–20. The ALJ found that Melissa had a moderate limitation in concentrating, persisting, or maintaining pace, but noted that this moderate limitation resulted from her multiple sclerosis; she suffered only a mild limitation in her ability to concentrate, persist, and maintain pace related to her depression. Id.

The ALJ concluded that Melissa retained the residual functional capacity ("RFC") to perform sedentary work. R. 21. She can occasionally reach overhead, kneel, crawl, crouch, stoop, balance, or climb. Id. She can have occasional exposure to extreme temperatures and vibrations. Id. She is limited to exposure to only moderate noise and can have no exposure to hazards and unprotected heights. Id. Melissa can perform occasional decision-making and can have occasional changes in work setting, but she cannot perform production rate or pace work. Id. The ALJ determined that Melissa was unable to perform any past relevant work, but she could perform jobs that exist in significant numbers in the national economy, such as addressing clerk, printed circuit board touchup screener, and stuffer. R. 30–31. Thus, the ALJ determined that Melissa was not disabled. R. 32. Melissa appealed the ALJ's decision and the Appeals Council denied her request for review on May 7, 2020. R. 1–4.

## ANALYSIS

Melissa alleges that the ALJ failed to properly assess her treating physician's opinion, determine her RFC using a function-by-function analysis, and assess her allegations regarding her symptoms.

### A. Medical History Overview

1. Medical Treatment

4

Melissa's primary care physician diagnosed her with multiple sclerosis before her alleged onset date. R. 357; see R. 362. Melissa began treating with Timothy Hormel, M.D., for her multiple sclerosis in April 2012, several months before her alleged onset date. R. 724–25.

In July 2012, Melissa presented at Brambleton Family Practice complaining of fatigue and body aches that began after receiving a tick bite. R. 483–84. Her treating physician completed lab work to determine if she had Lyme's disease. R. 447.

Melissa followed-up with Dr. Hormel and attending physicians at Brambleton Family Practice in August 2012. R. 433, 721. She complained of joint pain at both visits, but her physical exams were generally normal. See R. 443–44, 721. Dr. Hormel stated he was unable to determine if Melissa's symptoms resulted from multiple sclerosis or Lyme's disease; Melissa's physician at Brambleton Family Practice noted her symptoms were consistent with multiple sclerosis. R. 444, 721. In September 2012, Melissa began treatment with Cathryn Harbor, M.D. R. 398–400. Melissa complained of fatigue, arthritis, and hypothyroidism, among other symptoms. R. 398. Melissa's physical examination was normal, but Dr. Harbor diagnosed her with Lyme's disease. R. 399–400.

In December 2012, Dr. Hormel referred Melissa for MRIs. R. 766–67. MRI of Melissa's brain showed demyelination. R. 766. Melissa followed-up with Dr. Hormel, who noted she was undergoing Lyme's treatment. R. 719. He recommended she begin taking Gilenya for her multiple sclerosis. Id.

Melissa established care with Colonial Avenue Family Practice in 2013. R. 436. She complained of fatigue, dizziness, muscle and joint pain, and depression, among other symptoms. Id. Melissa's physical exam was generally normal, but she was prescribed depression medication. R. 437. Melissa attended several appointments with Dr. Hormel in 2013 where she

5

complained of joint pain and heaviness in her legs. R. 712–18. Dr. Hormel noted that she treated

for Lyme's disease and pain, but she was not undergoing immunotherapy for multiple sclerosis.

R. 713. Her physical examinations during this period were generally normal. R. 712–18.

Dr. Hormel adjusted Melissa's pain medication in 2013 and 2014 due to side effects and

discussed potential suppressant therapy for her multiple sclerosis. R. 711. In April 2014, Melissa

reported general discomfort as well as difficulty standing and lifting. R. 709. Dr. Hormel

suggested Melissa's gait and station were stiff and her ability to bend was impaired. Id. Her

physical examination revealed decreased range of motion in her right shoulder. Id. Melissa

followed-up and complained of sore joints and fatigue. R. 708. Dr. Hormel noted some

"wobbl[ing]" and warm joints, but otherwise Melissa's physical examination was relatively

normal. Id. She had several additional appointments with Dr. Hormel in 2014, where he noted

largely normal physical findings. R. 707–08.

Melissa established care with Floyd Family Practice in September 2014, and the

attending physician prescribed new depression medication. R. 420. She followed-up in October

2014 and reported that her depression was "somewhat better," but that the medication did not

help her pain. R. 417; see R. 706. Her examination revealed depression and joint pain but was

otherwise normal. R. 419.

In 2015, Melissa began reporting daily headaches. R. 533, 705. Her physical examination

at Floyd Family Practice resulted in largely normal findings. R. 536. Dr. Hormel referred her for

an MRI in early 2015 that showed an increased number of lesions, consistent with multiple

sclerosis. R. 702–05. Melissa followed-up with Dr. Hormel several times throughout 2015.

R. 698–701. Melissa reported fatigue, gastrointestinal issues, and vertigo, among other issues. Id.

Dr. Hormel noted some abnormal physical results at these appointments, including issues with

gait, flushing, and mild hyperreflexia, but these conditions appeared to resolve or were otherwise not mentioned at subsequent appointments in 2015. Id. During this period, Melissa had some reactions to medication and discussed the possibility of beginning immune stimulatory treatment for multiple sclerosis. Id.

In March 2016, Dr. Hormel referred Melissa for an MRI. R. 696. The MRI showed similar "plaque burden and distribution" to her 2015 MRI; the MRI showed at least one site of active demyelination. R. 758–59. In April 2016, Dr. Hormel referred Melissa to the Virginia Interventional Pain and Spine Center. R. 404–07. Her physical examination revealed some tenderness, restricted range of motion, and diminished muscle strength. R. 406. She followed-up with Dr. Hormel, who noted largely normal physical examination results; she also attended an appointment in July for issues with vision, which appeared to resolve. R. 695, 799–800.

Melissa attended physical therapy for her shoulder in late 2016. R. 805. Her physical therapist noted right shoulder instability. Id. She attended an appointment at Virginia Orthopaedic in November 2016, where she reported exacerbation of symptoms after hiking with a heavy pack. R. 808, 829. Her physical examination revealed generally full range of motion and 5/5 rotator cuff strength. R. 829. Her attending physician believed she had shoulder instability and a possible tear. R. 829. Melissa had an MRI of her shoulder, and her physician at Virginia Orthopaedic diagnosed her with right shoulder rotator cuff tear and referred her to James Farmer, M.D., for right shoulder surgery. R. 817–18, 827.

Dr. Farmer performed Melissa's right shoulder surgery in January 2017. R. 869. After surgery, Melissa noted that her shoulder pain improved and that she was "doing well," but declined to perform range of motion and strength exams due to pain. R. 855–56. At an April 2017 follow-up, Dr. Farmer noted Melissa was "doing quite well" and that "she has no pain that

she had prior to surgery," but noted Melissa complained of numbness and knots. R. 858. Dr.

Farmer found Melissa's shoulder stable, noting she had 4/5 or 5/5 strength in all shoulder

measures. Id. Melissa reported some pain and "clunking" at later appointments, but Dr. Farmer

continued reporting that she was doing well. R. 860–62.

Melissa re-established care at Brambleton Family Practice in October 2017. R. 959. Her

physical exam revealed normal gait, full range of motion, no tenderness, and normal mood.

R. 960. Plaintiff treated several times with Dr. Hormel in 2017 and early 2018. She reported

difficulty with fatigue, walking, and headaches. R. 899. Dr. Hormel noted issues with Melissa's

gait in April 2017, but otherwise her physical exams were generally normal. R. 896–99.

2.   Medical Opinions

In June 2018, Dr. Hormel completed a multiple sclerosis questionnaire. R. 903–08. Dr.

Hormel stated that Melissa had multiple sclerosis and identified multiple symptoms, including

fatigue, balance problems, weakness, pain, and difficulty remembering and solving problems.

R. 904. Dr. Hormel stated that Melissa's pain and fatigue would frequently interfere with her

attention and concentration. R. 906. He also noted that Melissa would only be able to sit 30-45

minutes at a time and stand for one hour at a time, and that she could sit for a four hours and

stand for two hours in an eight-hour day. R. 906. He additionally noted that she would need to

shift positions at will, that her legs should be elevated for approximately 25-30 minutes, and that

she would need to take frequent unscheduled breaks. R. 906–07. The ALJ gave Dr. Hormel's

opinion little weight. R. 28–29.

In November 2018, independent medical examiner Justin Willer, M.D., completed

interrogatories at the direction of the ALJ. R. 973. Dr. Willer found that Dr. Hormel's medical

opinion, specifically his statements regarding Melissa's ability to sit and stand, was not

supported by his treatment notes. R. 976. Dr. Willer noted that Melissa could sit, stand, and walk eight hours in an eight-hour workday and that she could continuously reach, handle, finger, and push and pull, and operate foot controls. R. 978–79. Dr. Willer found that Melissa had some postural and environmental limitations. R. 980–81. The ALJ gave Dr. Willer's opinion some weight. R. 27.

State agency physician Jameson Buston, M.D., reviewed the record in September 2016 and found Melissa capable of sedentary work. R. 110. He identified certain exertional, postural, and environmental limitations. R. 107–08. The ALJ gave Dr. Buston's opinion some weight. R. 27. State agency physician Tony Constant, M.D., reviewed the record in March 2017, and identified similar exertional, postural, and environmental limitations. R. 121–25. The ALJ gave Dr. Constant's opinion some weight.[5] R. 27.

### B. Treating Physician's Opinion

Melissa argues that the ALJ failed to give proper weight to her treating doctor, Dr. Hormel. Pl.'s Br. at 24–29, Dkt. 12. Melissa argues that "[t]he ALJ ignored significant evidence confirming the severity of [her] multiple sclerosis" and supporting Dr. Hormel's opinion. Pl.'s Br. at 27–29, Dkt. 12. She further argues that the ALJ did not point to persuasive evidence supporting granting only little weight to Dr. Hormel's opinion. Pl.'s Br. at 29, Dkt. 12.

The social security regulations require that an ALJ give the opinion of a treating source controlling weight if he finds the opinion "well-supported by medically acceptable clinical and

---

[5] The ALJ also reviewed Dr. Harbor's care plan as a medical opinion, and he gave her opinion little weight. R. 28, 374. Dr. Harbor stated that Melissa was her "most ill" patient and that it was appropriate for Melissa to apply for social security. R. 374. As the ALJ identified, Dr. Harbor provided no assessment of Melissa's functional abilities or limitations. Even assuming Dr. Harbor's notes qualified as a medical opinion, the ALJ explained that these statements were inconsistent with Melissa's generally normal physical examination results. See, e.g., 372–73. The ALJ's analysis is adequate. See Fox v. Astrue, No. 2:11–cv–223, 2012 WL 3070041, at *10 (D. Vt. July 30, 2012) ("The ALJ was not obligated to assign weight to treatment notes such as this, which made no assessments or opinions about [claimant's] functional or mental abilities."); see also Jaghamin v. Comm'r, 1:11–cv–1273, 2013 WL 1292061, at *7 (N.D.N.Y. Mar. 28, 2013).

laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record."[6] 20 C.F.R. § 404.1527(c)(2); Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001); Brown v. Comm'r, 873 F.3d 251, 269 (4th Cir. 2017) (noting that "the ALJ is supposed to consider whether a medical opinion is consistent, or inconsistent, with other evidence in the record in deciding what weight to accord the opinion"). Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996). The ALJ must give "good reasons" for not affording controlling weight to a treating physician's opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Saul v. Astrue, No. 2:09–cv–1008, 2011 WL 1229781, at *2 (S.D.W. Va. March 28, 2011).

Further, if the ALJ determines that a treating physician's medical opinion is not deserving of controlling weight, the following factors must be considered to determine the appropriate weight to which the opinion is entitled: (1) the length of treatment and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the opinion's support by medical evidence; (4) the opinion's consistency with the record as a whole; and (5) the treating physician's specialization. 20 C.F.R. §§ 404.1527(c)(2)–(5), 416.927(c)(2)–(5). "None of these factors may be omitted or disregarded by the ALJ in weighing the value of a treating physician's opinion." Ricks v. Comm'r, No. 2:09–cv–622, 2010 WL 6621693, at *10 (E.D. Va. Dec. 29, 2010). However, the ALJ "need not mechanically discuss every factor when choosing to afford a treating physician's opinion less weight, as long as the ALJ articulates the reasoning behind the

---

[6] The social security regulations regarding the evaluation of medical opinion evidence have been amended for claims filed after March 27, 2017. See 20 C.F.R. §§ 404.1520c, 416.920c (setting out rules for claims filed on or after March 27, 2017, including that no specific evidentiary weight, including controlling weight will be given to any medical opinions). However, as this claim was filed prior to the effective date of the amended rule, I will apply the rules in 20 C.F.R. §§ 404.1527(c), 416.927.

decision." <u>Haass v. Comm'r, Soc. Sec. Admin.</u>, No. CV BPG–17–1639, 2018 WL 2118705, at

*1 (D. Md. Apr. 4, 2018).

The ALJ did not ignore evidence supporting Dr. Hormel's opinion. "[T]here is no rigid

requirement that the ALJ specifically refer to every piece of evidence in his decision." <u>Reid v.</u>

<u>Comm'r</u>, 769 F.3d 861, 865 (4th Cir. 2014) (quoting <u>Dyer v. Barnhart</u>, 395 F.3d 1206, 1211

(11th Cir. 2005)). Moreover, contrary to Melissa's assertions, the ALJ acknowledged treatment

notes documenting Melissa's abnormal MRI findings (R. 23–25), fatigability (R. 24–25), slow or

stiff gait (R. 24–25, 28), eye pain (R. 25), weakness (R. 25–26, 30), and hyperreflexia (R. 25).

The ALJ also noted that Dr. Hormel had specifically "noted some findings, such as slight wobble

when the claimant sat or mild ataxia [and that he occasionally reported] stiff gait and station or

puffiness around her face and eye." R. 28–29. Nevertheless, the ALJ determined that Dr.

Hormel's opinion, which stated that Melissa's symptoms would frequently interfere with her

attention and concentration; that she could sit for a total of four hours and stand for a total of two

hours in an eight-hour day; that she would need to take unscheduled breaks; and, that her legs

required elevation, merited little weight. R. 28–29.

The ALJ appropriately considered the factors and the record.[7] The ALJ acknowledged

Dr. Hormel's long-term treatment of Melissa's multiple sclerosis, but ultimately found the

restrictions described were inconsistent with his own treatment notes and the medical evidence,

stating: "physical examination often revealed mostly normal findings, such as good reflexes,

strength, and coordination. She usually had normal gait and no hyperreflexia or spasticity."

---

[7] The ALJ concluded that the symptoms Dr. Hormel listed in his opinion were Melissa's subjective
allegations and not based on objective evidence. It is proper for an ALJ to discount a treating physician's opinion
when it is based largely on a claimant's self-reported symptoms. <u>Mastro v. Apfel</u>, 270 F.3d 171, 178 (4th Cir. 2001);
<u>Sawyer v. Colvin</u>, 995 F. Supp. 2d 496, 512 (D.S.C. 2014). Here, there is no direct indication whether Dr. Hormel's
medical opinion is based on Melissa's subjective reporting or on the observations Dr. Hormel made during his
course of treatment. Regardless, the ALJ provides sufficient support for his conclusion even when his analysis on
this point is set aside.

R. 23, 28–29; see, e.g., R. 705, 708, 716, 719, 725 (noting normal strength and reflexes); see,

e.g., R. 382, 390, 400, 960 (noting normal gait); see, e.g., R. 725, 810, 895 (noting coordination

in finger-nose test); see, e.g., R. 718 (suggesting no hyperreflexia or spasticity).

The ALJ also noted specific inconsistencies with Dr. Hormel's opinion and the medical

evidence generally. Dr. Hormel noted that Melissa's symptoms would frequently interfere with

her attention and concentration; nevertheless, the ALJ noted that Melissa "generally did not

complain to treating practitioners of difficulty maintaining concentration, persistence, and pace"

and that her mental status examinations similarly showed no general concentration, persistence,

or pace issues. R. 19–20; see, e.g., R. 373, 419, 699–700. Similarly, Dr. Hormel concluded

Melissa had some limitations regarding her ability to stand, sit, and walk, but the ALJ noted that

Melissa's treating providers only occasionally noted issues with gait and frequently described her

gait as normal. See, e.g., R. 382, 390, 400, 960. Finally, the ALJ noted that "the medical records

do not contain any evidence [that Melissa] needed to elevate her legs." R. 29.

The ALJ also found that Dr. Hormel's opinion is not supported by Melissa's activities of

daily living. The ALJ noted that in addition to caring for two children and performing necessary

household chores, including cooking, cleaning, and shopping, that Melissa participated in several

trips, including an out-of-state trip to her mother's house, a "backpacking expedition," and a trip

to visit friends in New York City. R. 18–19, 28–29. The ALJ stated "that these examples of trips

or expeditions all required a commitment of at least a few days of significant exertion" and that

participation in such activity was inconsistent with someone who would require unscheduled

breaks. R. 28. The ALJ further noted that these activities "require[d] significant ability to

understand, remember, and persist." Id.

The ALJ finally considered Dr. Hormel's opinion together with the opinions of the other reviewing doctors. R. 27–28. The ALJ noted that Dr. Willer, whom he gave some weight, specifically discounted Dr. Hormel's opinion, stating that Melissa's walking and sitting restrictions were not supported by Dr. Hormel's own treatment notes. R. 27. The ALJ found that Dr. Willer's conclusion was consistent with his own review of the medical record. Id. The ALJ also noted that the state agency doctors, whom he gave some weight "cited significant evidence that showed mostly normal physical examination findings despite positive clinical findings associated with multiple sclerosis." Id. These doctors additionally noted that any limitation in concentration, persistence, or pace was mild and that Melissa was capable of either light or sedentary work. R. 107–08, 121–25.

The ALJ adequately considered the factors outlined in 20 C.F.R. §§ 404.1527, and he justified the weight afforded with specific reasons. Having reviewed the record as a whole, I conclude that substantial evidence supports the ALJ's decision to discount Dr. Hormel's opinion.

### C.  Physical RFC and Function-by-Function Analysis

Melissa argues that the ALJ's physical RFC findings are not supported by substantial evidence, specifically regarding Melissa's ability "to maintain a static work posture, [her] need to take unscheduled breaks[,] and [her] rate of absenteeism." Pl.'s Br. at 31, Dkt. 12. Melissa additionally argues that the ALJ failed to discuss her vertigo and optic neuritis at Step Two of his analysis, failed to define "production rate or pace work," and generally ignored contradictory evidence. Pl.'s Br. at 30–33, Dkt. 12.

A function-by-function analysis requires the ALJ to develop an adequate RFC which accounts for the work activities the claimant can perform given the physical or mental impairments affecting his ability to work.  Importantly, the ALJ must explain the conclusions

reached and explain any record evidence which contradicts the RFC determination. See SSR 96-8p; see also Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (emphasizing that an ALJ needs to provide an explicit explanation linking medical evidence listed in the decision to his ultimate findings). The ALJ is instructed to cite specific medical facts and non-medical evidence supporting his conclusion, discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis, describe the maximum amount of each work-related activity the individual can perform, and explain how any material inconsistencies or ambiguities in the evidence were considered and resolved. SSR 96-8p, 1996 WL 374184, at *7.

 In Mascio v. Colvin, the court rejected a "per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis," agreeing instead with the Second Circuit that "'[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" Mascio, 780 F.3d at 636 (citing Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)). "The Mascio Court held remand was necessary, in part, because the ALJ failed to indicate the weight given to two residual functional capacity assessments which contained relevant conflicting evidence regarding the claimant's weight lifting abilities." Newcomb v. Colvin, No. 2:14–CV–76, 2015 WL 1954541, at *3 (N.D.W. Va. Apr. 29, 2015).

Here, the ALJ's decision includes the narrative discussion required by SSR 96–8P and contains sufficient information to allow meaningful review. Unlike the ALJ in Mascio, the ALJ in this case did not fail to consider conflicting medical evidence. See R. 23–26 (reviewing the medical record and considering conflicting evidence); R. 22–23, 27–28 (considering Melissa's

14

allegations). Further the court is "not left to guess about how the ALJ arrived at his conclusions" because the ALJ's findings include a comprehensive analysis of Melissa's medical records, the medical opinions, Melissa's hearing testimony, and the ALJ's conclusions. R. 22–30. The ALJ's opinion specifies how the limitations in the RFC correlate with her severe impairments.

As a preliminary matter, I find that the ALJ adequately explained what he meant by a job without "production rate or pace work." R. 21. This case must be distinguished from Thomas v. Berryhill, where the Court of Appeals held that the ALJ failed to adequately explain her conclusions regarding the claimant's mental impairments, including by limiting the claimant to no work "requiring a production rate or demand pace" but failing to explain the meaning of those terms. 916 F.3d 307, 312 (4th Cir. 2019), as amended (Feb. 22, 2019). The Thomas court stated:

> [W]hile the ALJ stated that Thomas could not perform work "requiring a production rate or demand pace," she did not give us enough to understand what those terms mean. That makes it difficult, if not impossible, for us to assess whether their inclusion in Thomas's RFC is supported by substantial evidence.

Id.; see also Perry v. Berryhill, 765 Fed. App'x 869, 872 (4th Cir. 2019) (concluding that, because the ALJ did not provide an explanation for the term "non-production oriented work setting" in assessing the RFC, she failed to build the required "logical bridge" between the evidence and her conclusion). Unlike in Thomas and Perry, the ALJ here explained the term "production rate or pace work." While questioning the vocational expert, the ALJ stated, "[e]liminate the jobs with strict rate or pace requirements. These are factory or assembly line jobs or just being in a different job where you have to make a certain number of calls or certain number of widgets with production quotas every day." R. 57. Accordingly, I am not left to guess what the ALJ meant when he included the limitation of no "production rate or pace work" in his RFC as he explained it during the hearing to both Melissa and the vocational expert. Thus, the jobs offered by the vocational expert excluded those where Melissa would have to work on an

assembly line or meet a certain production quota. See, e.g., Nelson v. Saul, No. 4:18–cv–163, 2019 WL 4748028, at *5 (E.D.N.C. Aug. 29, 2019), report and recommendation adopted, No. 4:18–cv–163, 2019 WL 4747048 (E.D.N.C. Sept. 27, 2019) (distinguishing Perry and Thomas because this "ALJ offered an explanation for what he meant by 'no production-rate or paced-rate work'—the ALJ wrote in a parenthetical, 'such as would be done on an assembly line.'"). Moreover, the ALJ explained that the RFC included "no production rate or pace work to accommodate any allegations of brain fogginess and any mental symptoms [Melissa] might experience from multiple sclerosis in combination with depression." R. 20; see also R. 27–29.

The ALJ also sufficiently addressed Melissa's vertigo and optic neuritis. The fact that the ALJ did not specifically address these impairments in his Step Two analysis does not constitute reversible error. Social Security regulations require an ALJ to consider the effects of both severe and non-severe impairments in Steps Three through Five. See 20 C.F.R. § 404.1523. The ALJ adequately addressed Melissa's vertigo in these steps, describing both her testimony and treatment records concerning vertigo. R. 22, 24, 26. Moreover, the RFC ultimately "precluded the claimant from exposure to heights and hazards in case [Melissa] experienced vertigo," but the ALJ noted that these vertigo symptoms were "infrequent . . . and she often described them as mild or modest." R. 29. Similarly, the ALJ adequately addressed Melissa's optic neuritis. He described Melissa's subjective allegations of eye pain in his analysis, R. 22, 25, but he ultimately concluded that Melissa "ha[d] not consistently complained of and sought treatment for symptoms related to her optic neuritis and vision problems related to multiple sclerosis," R. 29. The ALJ additionally noted that while Melissa "complained of eye pain and blurry vision in late 2016," that "she had nearly normal visual acuity with 20/25 in the left eye and 20/30 in the right eye"

16

and, furthermore, that "[s]he did not continue to consistently complain of vision symptoms."
R. 29.

Melissa also argues that the ALJ failed to make any specific findings regarding Melissa's
ability to maintain static work posture, need for breaks, and absenteeism. Concerning Melissa's
fatigue and need for breaks, the ALJ noted that participation in activities such as a backpacking
expedition and visiting friends and family out-of-state "all required a commitment of at least a
few days of significant exertion" and that "[i]t seems unlikely that a person with unpredictable
extreme fatigue" would voluntarily participate. R. 28. Moreover, the ALJ accounted for potential
fatigue caused by her Lyme's disease and multiple sclerosis and, accordingly, adjusted her RFC
to sedentary work despite her generally normal physical examination results. R. 21. The ALJ
also relied on the state agency doctors, who found Melissa was capable of work at the sedentary
or light level. R. 27. Concerning Melissa's ability to maintain a static work posture and her
ability to sit and stand more generally, the ALJ again relied on her participation in various
activities that involved periods of "significant exertion" and suggested "no significant limitation
to the ability to sit." R. 28–29. The ALJ also relied on Melissa's generally normal physical
exams and the state agency doctors and independent medical examiner's findings that she had a
greater ability to sit, stand, and walk than suggested by Dr. Hormel. R. 27. See Parker v.
Comm'r, No. 6:12–cv–29, 2013 WL 4507756, at *7 (W.D. Va. Aug. 23, 2013) (citing Halloran
v. Barnhart, 362 F.3d 28, 33 (2d Cir. 2004)) ("The regulations do not mandate the presumption
that all sedentary jobs in the United States require the worker to sit without moving."); Hairston
v. Astrue, No. 6:11–cv–57, 2013 WL 5151036, at *8–9 (Sept. 13, 2013) (finding claimant
capable of performing sedentary work despite need to shift positions during work).

Melissa also notes that the ALJ failed to address Dr. Hormel's treatment note that "when [Melissa] puts the arms out in front, she gets winging in the inferior." R. 809. Melissa argues that this note "seems to support a conclusion that is more restrictive than the finding by the ALJ that [she] is limited to occasional overhead reaching." Pl.'s Br. at 32, Dkt. 12. Melissa essentially asks the court to reweigh the evidence. Determining whether substantial evidence exists requires more than simply identifying medical records that are inconsistent with the ALJ's findings. Nevertheless, the ALJ found that Melissa "reported improvement, and physical examination showed objective improvement" after her 2017 rotator cuff surgery. R. 30; see, e.g., R. 858, 860, 862 (showing improvement in shoulder post-surgery). The ALJ further noted that Melissa "did not seek further [] treatment after she was released by her surgeon." R. 30. The ALJ also relied on the independent medical expert, who found that Melissa could continuously reach. R. 979.

The ALJ was only required to create a narrative discussion that builds "an accurate and logical bridge from the evidence to his conclusion," which the ALJ did in his discussion of the medical and non-medical evidence, Melissa's alleged symptoms, and the medical opinions of record. The ALJ considered Melissa's complaints and explained why the evidence did not support greater RFC restrictions. This narrative discussion allows this court to see how the evidence in the record, medical and nonmedical, supports the ALJ's RFC determination. Because I was not "left to guess" at how the ALJ reached his RFC determination, I find that the ALJ's conclusion is supported by substantial evidence. Mascio, 780 F.3d at 637.

### D.  Subjective Allegations

Melissa argues that the ALJ's assessment of her allegations is not supported by substantial evidence. Pl.'s Br. at 33–37, Dkt. 12. She argues that the ALJ incorrectly described

her activities of daily living and, additionally, that her activities of daily living do not show she can complete an eight-hour workday. Id.

When evaluating a claimant's symptoms, ALJs must use the two-step framework set forth in 20 C.F.R. § 404.1529 and SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). First, the ALJ must determine whether objective medical evidence presents a "medically determinable impairment" that could reasonably be expected to produce the claimant's alleged symptoms. 20 C.F.R. § 404.1529(b); SSR 16-3p, 2016 WL 1119029, at *3. Second, after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and whether the claimant is disabled. See 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *4. "At this step, objective evidence is *not* required to find the claimant disabled." Arakas, 2020 WL 7331494 at *6 (emphasis in the original) (citing SSR 16-3p, 2016 WL 1119029, at *4–5). SSR 16-3p recognizes that "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques." Id. at *4. Thus, the ALJ must consider the entire case record and may "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate" them. Id. at *5.

The ALJ's opinion includes a discussion of Melissa's medical history, along with Melissa's own allegations, and the ALJ adequately supported his finding that Melissa's allegations were not entirely consistent with the medical evidence and other evidence in the record. The ALJ noted Melissa's testimony regarding her general pain and fatigue, difficulties sitting or standing for long lengths of time, headaches, vertigo, and eye pain. R. 22. The ALJ

also described Melissa's testimony that she has good and bad days, but even on good days, she requires breaks. Id.

Melissa specifically argues that the ALJ mischaracterized her "backpacking expedition," noting "[t]he ALJ leaps to a conclusion that the medical note references a two-month backpacking 'expedition' and that is not what is contained in the actual office note." Pl.'s Br. at 35, Dkt. 12. She also alleges that, as she testified at the hearing, she did not participate in an "expedition," but rather engaged in "backpacking in the woods near her home." Id.

Dr. Hormel's treatment note stated "[Melissa] was out in late August and early September, backpacking. At that time period, she had a backpack on . . . At the backpacking expedition itself, she persisted trying to get through it." R. 808. The ALJ's characterization comports with this treatment note. The ALJ described Melissa's testimony that she just walked in the woods around her house. R. 28. He also noted that the treatment note indicated that her expedition "spanned parts of two months in 2016." R. 28. The ALJ stated that Melissa's testimony was inconsistent with the treatment note, stating "[i]f she were simply walking around the woods near her home, she could have just gone back home without needing to *persist* through an *expedition* that spanned parts of two months." Id. He ultimately concluded that, at the very least, this trip appeared to "require[] a commitment of at least a few days of significant exertion." Id. Thus, contrary to Melissa's argument, the ALJ accurately described the treatment note and appropriately analyzed the record and Melissa's testimony. See Exum v. Saul, No. 5:19–cv–39, 2019 WL 5208851, at *9 (E.D.N.C. Sept. 13, 2019) ("It is not the role of the court to re-weigh evidence or substitute its judgment for that of the ALJ.").

Melissa also points to <u>Brown</u>, 873 F.3d 251, to support her argument that the ALJ does not explain how her various activities of daily living show that she is capable of completing a full workday. Pl.'s Br. at 33–37, Dkt. 12. However, this case is distinguished from <u>Brown</u>, where the Fourth Circuit concluded that the ALJ had committed multiple errors, including failing to acknowledge the extent of the daily activities of living, writing:

> With respect to the first reason for the adverse credibility finding, the ALJ noted that Brown testified to daily activities of living that included "cooking, driving, doing laundry, collecting coins, attending church and shopping." <u>See</u> Second ALJ Decision 11. The ALJ did not acknowledge the extent of those activities as described by Brown, e.g., that he simply prepared meals in his microwave, could drive only short distances without significant discomfort, only occasionally did laundry and looked at coins, and, by the time of the second ALJ hearing, had discontinued regular attendance at church and limited his shopping to just thirty minutes once a week. Moreover, the ALJ provided no explanation as to how those particular activities—or any of the activities depicted by Brown—showed that he could persist through an eight-hour workday.

873. F.3d at 263. Here, unlike in <u>Brown</u>, the ALJ clearly understood the extent to which Melissa completed her activities of daily living. The ALJ noted that Melissa engaged in some chores, such as cooking, cleaning, shopping, driving, and caring for her children. R. 18–19. The ALJ described Melissa's testimony that she requires breaks, gave her subjective allegations some weight, and ultimately limited her to sedentary work based on these allegations. R. 27 ("Although physical examination findings usually showed mild abnormalities, multiple sclerosis and Lyme disease are known to cause some fatigue . . . Therefore, the undersigned has given some weight, but not great weight, to the claimant's subjective allegations and limits her to sedentary work.").

The ALJ also described Melissa's trips and activities in detail, noting that she participated in a backpacking expedition as well as two out-of-state trips, one with her children to her mother's house and one to visit friends in New York City. R. 28. The ALJ specifically recognized that these activities were all of short duration, but he noted that these trips required "a

commitment of at least a few days of significant exertion," whether that be hiking, traveling with children, or navigating public transportation. Id. Further, unlike in Brown, the ALJ pointed to more than those activities to discount Melissa's subjective allegations.[8] Beyond these activities of daily living, the ALJ noted that Melissa's allegations were inconsistent with her medical records, which often revealed fairly normal physical findings. See, e.g., R. 705. Melissa's allegations of disability were also inconsistent with the conclusions of the state agency doctors who found that Melissa's subjective allegations were not entirely consistent with the medical evidence. R. 106, 121. Finally, the ALJ may properly rely on evidence regarding a plaintiff's routine, non-work activities in rejecting a claim of disability. See Johnson v. Barnhart, 434 F.3d 650, 659 (4th Cir. 2005).

It is for the ALJ to determine the facts of a particular case and to resolve inconsistencies between a claimant's alleged impairments and his ability to work. See Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996); see also Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984) (finding that because the ALJ had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight). The ALJ's opinion was thorough and applied the proper legal standard, and I will not re-weigh the evidence. Accordingly, I conclude that the ALJ supported his analysis of Luke's subjective complaints with substantial evidence, and that Luke is capable of performing work at the level stated in the ALJ's opinion.

## CONCLUSION

It is **RECOMMENDED** that an order be entered **AFFIRMING** the final decision of the

---

[8] Also, unlike in Brown, the ALJ here did not fail to consider any doctor's opinions, or wrongly credit a psychiatric medical expert's testimony over the "consistent opinions of [five] treating and examining sources" who found disabling physical limitations. Brown, 873 F.3d at 266.

Commissioner, **GRANTING** summary judgment to the defendant, **DENYING** plaintiff's motion for summary judgment, and **DISMISSING** this case from the court's docket.

The clerk is directed to transmit the record in this case to Michael F. Urbanski, Chief United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days. Any adjudication of fact or conclusion of law rendered herein by the undersigned that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings, as well as to the conclusion reached by the undersigned, may be construed by any reviewing court as a waiver of such objection, including the waiver of the right to appeal.

Entered: August 2, 2021

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge