IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| **MELISA J.,** | ) | |
| | ) | |
| **Plaintiff** | ) | **Civil Action No. 7:20-CV-328** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **KILOLO KIJAKAZI, Acting Commissioner** | ) | |
| **Social Security,** | ) | **By:  Michael F. Urbanski** |
| | ) | **Chief United States District Judge** |
| | ) | |
| **Defendant** | ) | |

## MEMORANDUM OPINION

This social security disability appeal was referred to the Honorable Robert S. Ballou, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b)(1)(B), for proposed findings of fact and a recommended disposition. The magistrate judge filed a report and recommendation (R&R) on August 2, 2021, recommending that plaintiff's motion for summary judgment be denied, the Commissioner's motion for summary judgment be granted, and the Commissioner's final decision be affirmed. Plaintiff Melisa J. (Melisa) has filed objections to the R&R and this matter is now ripe for the court's consideration.

### I. Background

Melisa filed an application for disability insurance benefits on March 3, 2016, alleging disability beginning on July 1, 2012. Melisa was 41 years old at the alleged onset date. Based on her earnings record, Melisa had enough quarters of coverage to remain insured through December 31, 2017, making that her "date last insured" (DLI). R. 15.

Melisa claims disability based on multiple sclerosis, Lyme disease, mold toxicity, vertigo, chronic headaches, chronic nausea, near syncopal episodes, depression, anxiety with panic attacks, and all over body nerve pain. R. 114. The administrative law judge (ALJ) found that Melisa had serious impairments of multiple sclerosis, hypothyroidism, right shoulder degenerative joint disease-status post rotator cuff repair; cervical spine spondylosis, and headaches, but that none of her impairments met or medically equaled a listed impairment. The ALJ further found that Melisa had the residual functional capacity (RFC) to perform sedentary work with additional limitations of only occasionally reaching overhead, kneeling, crawling, crouching, stooping, balancing, or climbing. She could have only occasional exposure to extreme temperatures and vibrations and was limited to only moderate noise. She could have no exposure to hazards and unprotected heights. She could perform occasional decision-making and have occasional changes in the work setting. She could not perform production rate or pace work. Based on the testimony of a vocational expert, the ALJ concluded that Melisa could do work such as that of an addressing clerk, printed circuit board touchup screener, or stuffer, and that such jobs exist in significant numbers in the national economy. Therefore, he determined that Melisa was not disabled. R. 15-32. The Appeals Council denied Melisa's request for review, R. 1-3, making the ALJ decision the final decision of the Commissioner.

This lawsuit followed. The magistrate judge found that the ALJ determination was supported by substantial evidence and Melisa has objected to several of the magistrate judge's findings.

## II. Standard of Review of Magistrate Judge Decision

The objection requirement set forth in Rule 72(b) of the Federal Rules of Civil Procedure[1] is designed to "train[ ] the attention of both the district court and the court of appeals upon only those issues that remain in dispute after the magistrate judge has made findings and recommendations." United States v. Midgette, 478 F.3d 616, 621 (4th Cir. 2007) (citing Thomas v. Arn, 474 U.S. 140, 147–48 (1985)). An objecting party must do so "with sufficient specificity so as reasonably to alert the district court of the true ground for the objection." Id. at 622.

> To conclude otherwise would defeat the purpose of requiring objections. We would be permitting a party to appeal any issue that was before the magistrate judge, regardless of the nature and scope of objections made to the magistrate judge's report. Either the district court would then have to review every issue in the magistrate judge's proposed findings and recommendations or courts of appeals would be required to review issues that the district court never considered. In either case, judicial resources would be wasted and the district court's effectiveness based on help from magistrate judges would be undermined.

Id.

The district court must determine de novo any portion of the magistrate judge's report and recommendation to which a proper objection has been made. "The district court may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1).

---

[1] "Within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b).

If, however, a party "'makes general or conclusory objections that do not direct the court to a specific error in the magistrate judge's proposed findings and recommendations,'" de novo review is not required. Diprospero v. Colvin, No. 5:13-cv-00088-FDW-DSC, 2014 WL 1669806, at *1 (W.D.N.C. 2014) (quoting Howard Yellow Cabs, Inc. v. United States, 987 F. Supp. 469, 474 (W.D.N.C. 1997) and Orpiano v. Johnson, 687 F.2d 44, 47 (4th Cir. 1982)). "The district court is required to review de novo only those portions of the report to which specific objections have been made." Roach v. Gates, 417 F. App'x 313, 314 (4th Cir. 2011). See also Camper v. Comm'r of Soc. Sec., No. 4:08cv69, 2009 WL 9044111, at *2 (E.D. Va. 2009), aff'd, 373 F. App'x 346 (4th Cir.) ("The court will not consider those objections by the plaintiff that are merely conclusory or attempt to object to the entirety of the Report, without focusing the court's attention on specific errors therein."); Midgette, 478 F.3d at 621 ("Section 636(b)(1) does not countenance a form of generalized objection to cover all issues addressed by the magistrate judge; it contemplates that a party's objection to a magistrate judge's report be specific and particularized, as the statute directs the district court to review only 'those portions of the report or specified proposed findings or recommendations to which objection is made.'") (emphasis in original). Such general objections "have the same effect as a failure to object, or as a waiver of such objection." Moon v. BWX Technologies, 742 F. Supp. 2d 827, 829 (W.D. Va. 2010), aff'd, 498 F. App'x 268 (4th Cir. 2012). See also Arn, 474 U.S. at 154 ("[T]he statute does not require the judge to review an issue de novo if no objections are filed. . . .")

Rehashing arguments raised before the magistrate judge does not comply with the requirement set forth in the Federal Rules of Civil Procedure to file specific objections. Indeed,

objections that simply reiterate arguments raised before the magistrate judge are considered to be general objections to the entirety of the report and recommendation. See Veney v. Astrue, 539 F. Supp. 2d 841, 844-45 (W.D. Va. 2008). As the court noted in Veney:

> Allowing a litigant to obtain de novo review of her entire case by merely reformatting an earlier brief as an objection "mak[es] the initial reference to the magistrate useless. The functions of the district court are effectively duplicated as both the magistrate and the district court perform identical tasks. This duplication of time and effort wastes judicial resources rather than saving them, and runs contrary to the purposes of the Magistrates Act." Howard [v. Sec'y of Health & Human Servs.], 932 F.2d [505,] [] 509 [(6th Cir. 1991)].

Veney, 539 F. Supp. 2d at 846. A plaintiff who reiterates her previously raised arguments will not be given "the second bite at the apple she seeks;" instead, her re-filed brief will be treated as a general objection, which has the same effect as would a failure to object.  Id.

## III. Judicial Review of Social Security Determinations

It is not the province of a federal court to make administrative disability decisions. Rather, judicial review of disability cases is limited to determining whether substantial evidence supports the Commissioner's conclusion that the plaintiff failed to meet his burden of proving disability. See Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); see also Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). In so doing, the court may neither undertake a de novo review of the Commissioner's decision nor re-weigh the evidence of record. Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992). Evidence is substantial when, considering the record as a whole, it might be deemed adequate to support a conclusion by a reasonable mind, Richardson v. Perales, 402 U.S. 389, 401 (1971), or when it would be sufficient to refuse a directed verdict in a jury trial. Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996).

Substantial evidence is not a "large or considerable amount of evidence," Pierce v. Underwood, 487 U.S. 552, 565 (1988), but is more than a mere scintilla and somewhat less than a preponderance. Perales, 402 U.S. at 401; Laws, 368 F.2d at 642. "It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Biestek v. Berryhill, 139 S.Ct. 1148, 1154 (2019) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed. 42 U.S.C. § 405(g); Perales, 402 U.S. at 401.

## IV.  Plaintiff's Objections[2]

Melisa objects to the following findings of the magistrate judge: (1) The ALJ gave proper weight to the opinion of Melisa's treating physician; (2) the ALJ's residual functional capacity (RFC) assessment is supported by substantial evidence; and (3) the ALJ properly considered Melisa's subjective allegations.

### A. Opinion of the Treating Physician

In general, an ALJ must accord more weight to the medical opinion of an examining source than to that of a nonexamining source. Testamark v. Berryhill, 736 F. App'x. 395, 387 (4th Cir. 2018) (citing 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1) and Brown v. Comm'r of Soc. Sec. Admin., 873 F.3d 251, 268 (4th Cir. 2017)). Treating sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of the claimant's medical impairments. Id. (citing Woods v. Berryhill, 888 F.3d 686, 695 (2018)). "[T]he ALJ is required to give controlling weight to opinions proffered by a claimant's treating physician so long as

---

[2] Detailed facts about Melisa's impairments and medical and procedural history can be found in the report and recommendation (ECF No. 21) and in the administrative transcript (ECF No. 5) and will not be repeated here except as necessary to address her objections.

the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the claimant's case record." Lewis v. Berryhill, 858 F.3d 858, 867 (4th Cir. 2017) (alterations and internal quotations omitted).[3] If an ALJ does not give controlling weight to the opinion of a treating source, the ALJ must consider a non-exclusive list of factors to determine the weight to be given all the medical opinions of record, including (1) examining relationship; (2) treatment relationship; (3) supportability of the source's opinion; (4) consistency of the opinion with the record; and (5) specialization of the source. Testamark, 736 F. App'x at 398; 20 C.F.R. § 404.1527(c). "An ALJ must include 'a narrative discussion describing how the evidence supports' his 'explanation of the varying degrees of weight he gave to differing opinions concerning [the claimant's] conditions and limitations.'" Woods, 888 F.3d at 695 (citing Monroe v. Colvin, 826 F.3d 176, 190 (4th Cir. 2018)). An ALJ may give greater weight to the opinions of nontreating and nonexamining sources if the decision provides "sufficient indicia of supportability in the form of a high-quality explanation for the opinion and a significant amount of substantiating evidence, particularly medical signs and laboratory findings; consistency between the opinion and the record as a whole; and specialization in the subject matter in the opinion." Id.

Starting in 2012, Melisa saw neurologist Timothy Hormel, M.D., for treatment of her multiple sclerosis. On June 29, 2018, Dr. Hormel completed a form titled "Multiple Sclerosis

---

[3] The Social Security Administration has amended the treating source rule effective March 27, 2017, for claims filed after that date.  Under the new rule, the SSA will consider the persuasiveness of all medical opinions and evaluate them primarily on the basis of supportability and consistency.  20 C.F.R. § 404.1520c(a), (c)(1)-(2). Because Melisa's claim was filed before the effective date of the change, the decision is reviewed under the regulation in effect at that time, 20 C.F.R. § 404.1527.

Residual Functional Capacity Questionnaire." On the form, he checked boxes indicating that Melisa's symptoms include fatigue, balance problems, weakness, numbness, tingling or other sensory disturbance, sensitivity to heat, pain, difficulty remembering, depression, emotional lability, and difficulty solving problems. R. 904. In response to the question of whether Melisa had significant reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, he circled "yes" and "no" and said Melisa had not "been tested to the above [illegible]." He also indicated that Melisa had not had exacerbations of her multiple sclerosis during the past year. R. 905. Dr. Hormel indicted that emotional factors contributed to the severity of Melisa's symptoms and functional limitations and that her limitations were reasonably consistent with the symptoms and functional impairments described in the evaluation. Id.

Dr. Hormel opined that Melisa's pain, fatigue, and other symptoms would frequently interfere with her attention and concentration, but also found her capable of low stress work. He stated that Melisa could walk three city blocks without rest and that she could sit for thirty to forty-five minutes before needing to stand up. R. 906. He also stated that Melisa could stand for an hour, sit about four hours, and stand/walk about two hours in an eight-hour day. He said she needed a job where she could stand, sit, or walk at will and that she would need to take four unscheduled breaks per day for about fifteen minutes each. If sitting, Melisa would need to have her legs elevated for twenty-five to thirty percent of the day, although Dr. Hormel "guestimated" at this number. Dr. Hormel did not believe Melisa needed a cane to walk. R. 907.

The ALJ gave Dr. Hormel's opinion little weight, finding that even though he treated Melisa, his opinion was not supported by his treatment records or other medical evidence of record. The ALJ stated that the "check-box" symptoms Dr. Hormel found were based on Melisa's subjective complaints. Dr. Hormel's treatment records showed some occasional symptoms, such as a slight wobble when Melisa sat, mild ataxia, an occasional stiff gait and station, and puffiness around her face and eye. R. 28-29. However, the ALJ found that physical examination of Melisa revealed mostly normal findings such as good reflexes, strength, and coordination, and that she usually had a normal gait and no hyperreflexia or spasticity. The ALJ also found that Melisa took part in activities that suggested no significant limitation in her ability to sit or that she needed unscheduled breaks and that the medical records contained no evidence that Melisa needed to elevate her legs. R. 29.

The ALJ also pointed out that Justin Willer, M.D., a neurologist and independent medical expert, examined Melisa's medical records. Dr. Willer disagreed with Dr. Hormel's assessment, finding it unsupported by his progress notes which did not mention such limitations. R. 27, 973-982.

Melisa argued to the magistrate judge that the ALJ erred in giving little weight to Dr. Hormel's opinion regarding her limitations because he ignored significant evidence confirming the severity of her multiple sclerosis and failed to point to persuasive evidence in support of his decision regarding the weight given to the opinion. The magistrate judge found that the ALJ did not ignore evidence supporting Dr. Hormel's opinion but properly considered all the 20 C.F.R. § 404.1527(c) factors and the evidence in the record.

Melisa objects to this finding, again arguing that the ALJ either ignored evidence in the record or cherry-picked the evidence that supports his determination. She asserts that the ALJ mentioned that Melisa underwent a brain MRI in March 2015 but failed to acknowledge that the MRI showed extensive white matter lesions compatible with multiple sclerosis that were noted to have progressed since the previous study of May 2011, citing R. 492-494. However, the ALJ noted that Melisa underwent brain MRIs in 2015 "which showed worsening T2 foci and abnormal signal consistent with multiple sclerosis." R. 24 (citing R. 694-703). The ALJ also acknowledged Melisa's multiple sclerosis later in the determination, stating, "The undersigned notes that objective evidence, such as brain and cervical spine MRIs confirmed multiple sclerosis, but a diagnosis in and of itself does not necessarily equate to such significant limitations." R. 28.

Melisa also claims the ALJ ignored evidence from Dr. Hormel in April 2015 that on two trials it took plaintiff 14 and 18 seconds to walk 25 feet. R. 701. However, the ALJ acknowledged that physical examination by Dr. Hormel sometimes revealed a slow gait. R. 24, 25, 694-703. Melisa further argues that the ALJ ignored evidence from a pain management physician whose initial evaluation showed a restricted range of motion due to pain and diminished muscle strength bilaterally in her lower extremities. R. 406. The ALJ did refer to this record, albeit to a different copy. See R. 24, 524-527. Melisa is correct that he did not note that she had a restricted range of motion due to pain. Nevertheless, it is well established than an ALJ need not cite every piece of evidence in the record. Reid v. Comm'r of Soc. Sec., 769 F.3d 861, 865 (2014). The ALJ noted that Melisa had normal muscle tone and bulk, diffuse tenderness throughout her back and lower extremities, slightly reduced muscle strength

bilaterally,[4] and normal reflexes. She also had a negative straight leg test. R. 24, 526. The fact that the ALJ failed to note that Melisa had a restricted range of motion due to pain does not mean that his decision to give Dr. Hormel's assessment little weight is not supported by substantial evidence, given the evidence as a whole.

Melisa objects that the magistrate judge erred when he determined that the ALJ discounted Dr. Hormel's opinion in part because it was inconsistent with other medical evidence in the record. For example, Dr. Hormel opined that Melisa's symptoms would frequently interfere with her attention and concentration, but the ALJ noted that she generally did not complain to treating practitioners of difficulty maintaining concentration, persistence, or pace. Melisa argues that the ALJ did not acknowledge her complaints of "brain fog" and trouble thinking and focusing. However, the ALJ did note her complaint, stating that Melisa "infrequently mentioned brain fogginess related to her multiple sclerosis." R. 19. In addition, the ALJ accounted for her reports of "brain fog" by limiting her to jobs with only occasional decision-making and changes in work setting, with no production rate or pace work. R. 27.

Melisa also objects to the magistrate judge's conclusion that the ALJ supported his determination by noting that her treatment providers only occasionally noted issues with her gait and frequently described her gait as normal. Melisa claims that the evidence in the record shows that her gait was described as abnormal as frequently as it was noted to be normal and that the ALJ's finding that treating providers only occasionally noted issues with her gait was

---

[4] Melisa's muscle strength was noted to be 5-/5. R. 526. Strength of 5/5 means the muscle is functioning normally and 4/5 means that the muscle is able to contract and provide resistance but when maximum strength is exerted, the muscle is unable to maintain the contraction. https://www.verywellhealth.com/muscle-strength-measurement-2696427 (last viewed September 17, 2021).

error. Assuming Melisa's assertion is true, disagreement with the ALJ's evaluation of the evidence in the record, or the fact that the evidence may support an opposite conclusion, is not grounds for reversal. <u>Mary R. v. Saul</u>, No. 3:19cv903, 2021 WL 388463, at *7 (E.D. Va. Jan. 19, 2021) (citing <u>Dunn v. Colvin</u>, 607 F. App'x 264, 274 (4th Cir. 2015)).

Melisa further objects to the magistrate judge's finding that the ALJ's discounting of Dr. Hormel's assessment was supported by Melisa's activities of daily living. The ALJ noted that Melisa cared for two young children and did household chores, including cooking, cleaning, and shopping. She also took an out-of-state trip to visit her mother, went on a "backpacking expedition," and took a trip to visit friends in New York City. The ALJ found that these trips were inconsistent with Dr. Hormel's assessment because they suggested no significant limitation in her ability to sit or that she needed unscheduled breaks. R. 29.

Melisa objects that the ALJ and magistrate judge overstated her participation in these events and ignored the evidence surrounding the activities documenting her limited participation and the fact that she could take breaks as needed, perform the activities at her own pace, and that she required assistance with many of the activities. Melisa characterized the "backpacking expedition" as walking on trails behind her house and carrying a backpack with water bottles for her children. R. 76-78.  She described her trip to New York City as not involving a lot of walking, but she took a train and ferry to meet friends. She fell on that trip and injured her wrist and spent time in the hospital. R. 55-56. She said that when she does household chores, she gets out of breath doing things like taking the laundry downstairs. R. 90. She also testified that she can sit in a car for a couple of hours, although she will have to shift around. R. 91.

Accepting as true Melisa's testimony that the "backpacking expedition" consisted of walking on the acreage behind her house with her children, it still is inconsistent with Dr. Hormel's finding that she could walk for only three city blocks. Also, her testimony that she could sit in a car for a couple of hours is inconsistent with Dr. Hormel's finding that she can sit for only thirty to forty-five minutes at a time. In any case, it is the job of the ALJ to make findings of fact and resolve conflicts in the evidence, Hays, 907 F.2d at 1456. The ALJ in this case has cited to Melisa's activities of daily living as part of his determination to give Dr. Hormel's opinion little weight. Melisa is asking the court to reweigh the evidence, which is outside the scope of review.

Melisa also argues that the ALJ erred when he gave Dr. Willer's opinion and the opinions of the state agency doctors only "some" weight, but then relied on their opinions to give Dr. Hormel's opinion little weight. The ALJ gave the opinions of these non-examining physicians only "some" weight because he found that their assessments did not take into account that multiple sclerosis and Lyme disease are known to cause fatigue which is not easily measured by objective evidence. R. 27. It is not inconsistent to give the opinions "some" weight while recognizing that that their assessments differed from those of Dr. Hormel. Moreover, "it is unreasonable to expect that the ALJ will recite every recommendation in every opinion and provide different reasoning for accepting or rejecting each portion." Moore v. Saul, 822 F. App'x 183, 186 (4th Cir. 2020) (per curiam), abrogated on other grounds by Arakas v. Comm'r Soc. Sec. Admin., 983 F.3d 83 (4th Cir. 2020)).

The court agrees with the magistrate judge that the ALJ in this case properly supported his decision to give Dr. Hormel's opinion little weight. The ALJ assessment relies on the

factors set forth in 20 C.F.R. § 404.1527(c) and he included the required narrative discussion describing how the evidence supported the weight he gave to differing opinions in the record. Therefore, Melisa's objection to the magistrate judge finding on this issue is **OVERRULED**.

### B. RFC Assessment

The ALJ found that Melisa could do sedentary work with additional limitations of only occasionally reaching overhead, kneeling, crawling, crouching, stooping, balancing, or climbing, only occasional exposure to extreme temperatures and vibrations, exposure to only moderate noise, and no exposure to hazards and unprotected heights. Melisa could perform occasional decision-making and have occasional changes in the work setting and could not perform production rate or pace work.

### (1) Production Rate or Pace Work

Melisa objects that the ALJ failed to define "production rate or pace work" in the RFC. In Thomas v. Berryhill, 916 F.3d 307, 312 (4th Cir. 2019), the court found that an ALJ stated that the claimant could not perform work requiring a production rate or demand pace but failed to give enough information to understand the meaning of the terms. The Commissioner argued that the terms were common vocationally relevant functional limitations, but the court found that the term was not common enough for its meaning to be clear without elaboration. The court found that this was one of four errors the ALJ made and remanded the case, asking the ALJ to give a clearer window into her reasoning. Id. at 313. Similarly, in Perry v. Berryhill, 765 F. App'x 869, 872 (4th Cir. 2019), the Fourth Circuit found that when an ALJ determined that a claimant could work only in a "non-production oriented work setting" but did not define

what she meant by the phrase, the court could not evaluate whether the restriction properly accounted for the claimant's limitations.

At the hearing in Melisa's case, when the ALJ presented the hypothetical question to the vocational expert, he asked the expert to eliminate jobs with strict production rate or pace requirements. The ALJ added that he meant to exclude "factory or assembly line type jobs where you have to make a certain number of calls of [sic] certain number of widgets with production quotas every day." R. 57.

Melisa argued to the magistrate judge that the ALJ did not explain in his determination what he meant by "production rate or pace work." The magistrate judge found that because the ALJ explained to the vocational expert what he meant, the magistrate judge was not left to guess about the meaning of the term. Melisa objects that although the ALJ gave that definition at the hearing, "there is no indication in his decision that he continued to use that same definition in his RFC findings or if he used a different definition because the ALJ does not explain what definition he used in his decision." Objs., ECF No. 22 at 5.

The court agrees with the magistrate judge. Although the ALJ did not define "production rate or pace work" in his determination, he defined it when presenting the hypothetical question to the vocational expert. Therefore, unlike in Thomas and Perry, the court has the ability to assess whether the inclusion of the term in Melisa's RFC is supported by substantial evidence. See also Summerfield v. Saul, No. 5:19-CV-162, 2020 WL 2105850, at *8 (N.D.W.V. Apr. 16, 2020) (finding when ALJ used the term "fast-paced production requirements" in hypothetical to the vocational expert and neither the expert nor the

claimant's attorney asked for clarification, it was reasonable to conclude that they both understood the term "fast-paced production requirements" as it applied to the claimant's case).

Melisa cites to nothing in the record or case law to support her argument that the ALJ might have meant something different when he used the term in his decision. Accordingly, the court finds that the ALJ did not err by failing to define "production rate or pace work" in his RFC determination.

### (2) Vertigo and Optic Neuritis

Melisa argued to the magistrate judge that the ALJ failed to address her optic neuritis and vertigo in his RFC assessment. The magistrate judge found that although the ALJ did not address the optic neuritis at Step 2 of the sequential evaluation,[5] he acknowledged her testimony that she had eye pain and foggy vision in his RFC assessment. R. 22, 25. The ALJ noted that Melisa had nearly normal visual acuity with 20/25 in her left eye and 20/30 in her right eye. The ALJ found that she had not consistently complained of or sought treatment for optic neuritis and vision problems related to her multiple sclerosis. R. 29. Melisa objects that

---

[5] In conducting the sequential evaluation, the ALJ makes a series of determinations: (1) Whether the claimant is engaged in substantial gainful activity; (2) Whether the claimant has a medically determinable impairment that is "severe" under the regulations; (3) Whether the severe impairment or combination of impairments meets or medically equals the criteria of a listed impairment; (4) Whether the claimant has the RFC to perform his past relevant work; and (5) Whether the claimant is able to do any other work in the national economy, considering his RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(a) and 416.920(a). If the ALJ finds that the claimant has been engaged in substantial gainful activity at Step 1 or finds that the impairments are not severe at Step 2, the process ends with a finding of "not disabled." Mascio v. Colvin, 780 F.3d 632, 634-635 (4th Cir. 2015). At Step 3, if the ALJ finds that the claimant's impairments meet or equal a listed impairment, the claimant will be found disabled. Id. at 635. If the analysis proceeds to Step 4 and the ALJ determines the claimant's RFC will allow him to return to his past relevant work, the claimant will be found "not disabled." If the claimant cannot return to his past relevant work, the ALJ then determines, often based on testimony from a vocational expert, whether other work exists for the claimant in the national economy. Id. The claimant bears the burden of proof on the first four steps and the burden shifts to the Commissioner on the fifth step. Id.

the ALJ merely summarized the evidence but did not explain how he addressed the impairments in the RFC.

The ALJ cited SSR 16-3p, 2017 WL 5180304 (S.S.A. 1017), for its comment that an adjudicator will consider how the frequency or extent of the treatment sought by an individual compares with the degree of the individual's subjective complaints. Id. at *9. The ALJ relied on the fact that Melisa did not consistently complain of or seek treatment for optic neuritis to find that her symptoms were not as great as alleged. Melisa objects that the ALJ did not explain how he addressed this impairment in his RFC finding, but according to his opinion, he imposed no limitation based on her complaints of optic neuritis because found she had nearly normal visual acuity. R. 29.

Regarding vertigo, the ALJ found that Melisa infrequently complained of symptoms of vertigo and often described the symptoms as mild or moderate. Id. He found that she rarely complained of falling and first complained of it in 2017. Id. She reported some benefit from the medications used for headaches and vertigo. R. 30. To accommodate her vertigo, the RFC included a requirement that Melisa have no exposure to heights or hazardous machinery. R. 27. Melisa points to nothing in the record to show that the ALJ should have included additional RFC restrictions to accommodate either the optic neuritis or the vertigo.

**(3) Fatigue**

Melisa argues that the RFC assessment failed to account for her fatigue or address her ability to maintain a static work posture, citing in support Monroe, 826 F.3d at 189. In Monroe, the ALJ acknowledged that the claimant suffered from sleep apnea and narcolepsy, and the claimant testified that he would lose consciousness two or three times per day and would need

to take breaks because of fatigue. Id. at 188. However, the ALJ did not make specific findings about whether the claimant's sleep apnea and narcolepsy would cause him to experience loss of consciousness at work or fatigue such that he would need breaks. Id. The court remanded that case with instructions that the ALJ consider the narcolepsy and apnea along with the claimant's other impairments and determine on a function-by-function basis how they affected his ability to work. Id.

In this case, the ALJ acknowledged that multiple sclerosis and Lyme disease are known to cause fatigue and for that reason he limited Melisa to sedentary work. R. 27. The ALJ discounted her reports of disabling fatigue by pointing to her activities of daily living, including hiking with a backpack and taking other trips. He concluded the following:

> The undersigned notes that these examples of trips or expeditions all required a commitment of at least a few days of significant exertion. It seems unlikely that a person with unpredictable extreme fatigue requiring one to nap or stay in bed all day would voluntarily choose to embark on such trips or expeditions. Even if the claimant has some days with fatigue, she could likely perform sedentary work if she can commit to such trips and expeditions.

R. 28. As noted, Melisa disputes that she went on a backpacking "expedition" but testified that she hiked on a parcel of land behind her house. Regardless of the extent of her hiking, the ALJ in this case did not commit the error committed by the ALJ in Monroe. He acknowledged and accommodated Melisa's complaints of fatigue by limiting her to sedentary work and explained why he found her complaints of debilitating fatigue to be inconsistent with the evidence in the record.

### (4) Forward Reach

Melisa argued to the magistrate judge that the notation by Dr. Hormel that she had problems extending her arms in front of her supports a conclusion that her RFC should be

more restrictive than just limiting her to occasionally reaching overhead. Dr. Hormel stated in November 2016 that when Melisa put her arms out in front, she had "winging" in the inferior, which put increasing stressors on the right shoulder.[6] R. 808-09. Dr. Hormel recommended strengthening exercises and the use of focal ultrasound. R. 809.

The ALJ noted that an MRI of Melisa's shoulder in December 2016 showed a partial thickness tear of the posterior supraspinatus tendon and mild subacromial subdeltoid bursitis. R. 25, 817. On November 16, 2016, physical examination of the shoulder by Physician Assistant Mackenzie Prandi showed a generally full range of motion, 5/5 rotator cuff strength, appositive bear hug and belly press and a 2+ load and shift test, with harsh popping with range of motion with abducted motion. R. 829. On December 9, 2016, Melisa had a full passive range of motion with 4/5 strength within the supraspinatus and mildly positive signs for impingement. The bear hug and belly press tests were negative and Ms. Prandi said she could not ascertain any instability with anterior or posterior load and shift. R. 827.

Melisa underwent right rotator cuff repair and shoulder arthroscopy on January 13, 2017. R. 860. In April 2017, she reported that she had none of the pain that she experienced prior to surgery, and no mechanical clicking, catching, or popping. She had a little numbness along the anterior aspect of the proximal arm near the anterior deltoid. She had a full range of motion in both shoulders. She had normal strength in her left shoulder and 4+/5 in her right

---

[6] The term 'winged scapula' (also scapula alata) is used when the muscles of the scapula are too weak or paralyzed, resulting in a limited ability to stabilize the scapula. As a result, the medial or lateral borders of the scapula protrudes from back, like wings. The main reasons for this condition are musculoskeletal- and neurological-related. Winging of scapula disturbs scapulohumeral rhythm; contributes to loss of power and limited flexion and abduction of the upper extremity and can be a source of considerable pain. This debilitating condition that can affect the ability to lift, pull, and push heavy objects, as well as to perform daily activities of living, such as brushing one's hair and teeth and carrying grocery bags. https://www.physio-pedia.com/Winged_scapula (last viewed Sept. 20, 2021).

shoulder. R. 858. In September 2017, she reported some crepitation at the superior angle of the scapula primarily with protraction and retraction. She had full range of motion and strength in both shoulders. R. 862.

The ALJ cited to these records to find that the rotator cuff surgery was generally successful in relieving the symptoms of pain in her shoulder and that she did not seek further treatment for the shoulder. R. 30. Melisa argues that the ALJ ignored the fact that Dr. Hormel noted that her bilateral upper extremity limitations in reaching were the result of her multiple sclerosis and not due to her rotator cuff injury. Be that as it may, the fact remains that in September 2017, Melisa had full range of motion and full strength in both shoulders. The ALJ was entitled to rely on that finding to determine that Melisa's only limitation in reaching was that she could only occasionally reach overhead.

For the above reasons, the court finds that the ALJ's assessment of Melisa's RFC is supported by substantial evidence. Her objection to the magistrate judge's conclusion on this issue is **OVERRULED**.

### C. Subjective Allegations

The regulations that were in effect at the time Melisa filed her claim provided the following discussion of how the Social Security Administration analyzes subjective allegations of symptoms:

> In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence, and other evidence. By objective medical evidence, we mean medical signs and laboratory findings as defined in § 416.928(b) and (c). By other evidence, we mean the kinds of evidence described in §§ 416.912(b)(2) through (8) and 416.913(b)(1), (4), and (5), and (d). These include statements or reports from you, your treating or nontreating source, and others about your medical history, diagnosis, prescribed

treatment, daily activities, efforts to work, and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work . . . . We will consider all of your statements about your symptoms, such as pain, and any description you, your treating source or nontreating source, or other persons may provide about how the symptoms affect your activities of daily living and your ability to work . . . . However, statements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled. In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings and statements about how your symptoms affect you. . . . We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work . . . .

20 C.F.R. § 416.1529 (2011).

Melisa's subjective complaints include debilitating fatigue, pain, and vertigo such that she has to lie down during much of the day. She said she has to nap most days and that she has daily pain everywhere. She testified that she has difficulty reaching because of spasms in her back, trouble typing because her fingers feel numb and heavy, and that she drops things often. She complained of daily headaches as well as eye pain and foggy vision. R. 81-91. As discussed above, the ALJ did not find her complaints consistent with the medical evidence or opinion evidence in the record, or with her reported activities of daily living.

Melisa argued to the magistrate judge that the ALJ ignored the fact that she testified that she has good days and bad days, which explains why she sometimes is able to do things such as travel with her children, while at other times she cannot get out of bed. Melisa also

reiterated her argument that she did not go on a backpacking "expedition," but rather walked around on acreage behind her house.

The magistrate judge found that the ALJ adequately explained why he found Melisa's subjective allegations inconsistent with the evidence of record. Contrary to Melisa's assertion that the ALJ ignored her testimony about having good days and bad days, the ALJ noted the testimony in his determination, including her testimony that even on the good days she needs to take breaks. R. 22. The magistrate judge also found that regarding the backpacking, the ALJ accurately described the treatment note in the record which stated that Melisa "was out in late August and early September, backpacking. At that time period, she had a backpack on . . . At the backpacking expedition itself, she persisted in trying to get through." R. 28, 808. The ALJ acknowledged Melisa's characterization of the outing as walking in the woods outside her home, R. 28, but found it inconsistent with the treating note that characterized it, presumably based on Melisa's description, as an expedition that required persistence after her shoulder began to hurt. Id. The magistrate judge correctly found that it is not the role of the court to re-weigh the evidence or substitute its judgment for that of the ALJ.

The court agrees with the magistrate judge that the ALJ properly assessed the intensity and persistence of Melisa's symptoms. In addition to citing to the backpacking outing, her other travel, and her daily activities, the ALJ determined that the objective evidence in the record showed mostly mild abnormalities and while she clearly had a diagnosis of multiple sclerosis with some mild physical examination findings, she usually had a normal gait, reflexes, and strength in her extremities. He further noted that she got relief from her shoulder pain with rotator cuff surgery and received some benefit from medication for her headaches and

vertigo. She also experienced pain relief with medication. R. 29-30. Thus, the ALJ adequately explained why he found Melisa's subjective allegations not fully supported by the record.

Melisa also argued that remand in her case was called for by the holding in Brown v. Comm'r Soc. Sec. Admin., 873 F.3d 251 (4th Cir. 2017). In Brown, the Fourth Circuit remanded a claim to the Social Security Administration in part because the ALJ listed a claimant's daily activities of cooking, driving, doing laundry, collecting coins, attending church, and shopping in support of the finding that the claimant was not disabled, but did not acknowledge the limited extent of the activities or explain how the activities showed he could sustain a full-time job. See also Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000) (observing that it is not enough for an ALJ to state in a conclusory manner that a claimant's testimony regarding limitations placed on his daily activities was unsupported by the medical evidence; rather, an ALJ must articulate "some legitimate reason for his decision" and "build an accurate and logical bridge from the evidence to his conclusion.")

In Melisa's case, the magistrate judge found that the ALJ clearly understood Melisa's limits in completing her activities of daily living, including acknowledging her testimony that she requires breaks when she engages in chores. The ALJ gave her subjective allegations some weight when he limited her to sedentary work. He also noted that her out-of-state trips were of short duration but required a commitment of at least as few days of significant exertion. In addition, the magistrate judge noted that the ALJ relied on more than Melisa's activities of daily living to find that she was not disabled. He cited to records from treatment providers that were inconsistent with her allegations of disabling fatigue and pain and to the opinions of the state agency doctors who found her subjective allegations inconsistent with the record.

The court agrees with the magistrate judge's conclusion that unlike in <u>Brown</u>, the ALJ in Melisa's case did not rely only on her activities of daily living to find that his allegations of disabling impairment were not wholly consistent with the record.

Additionally, in <u>Brown</u>, the Fourth Circuit did not remand the case solely because the ALJ did not explain how Brown's limited activities indicated that he could work an eight-hour workday. Rather, the court found that the ALJ misstated the record regarding the claimant's physical activities and the amount of pain he reported; misstated the effect of injections on the claimant's pain; misstated the claimant's testimony at the ALJ hearing; relied on his own observations and medical judgments in assessing the claimant's pain; and rejected the consistent opinions of the claimant's treating and examining sources in favor of the opinion of the non-examining state-agency physician. <u>Brown</u>, 873 F.3d at 263-266. None of those concerns are present in Melisa's case.

The court finds that the ALJ thoroughly considered Melisa's subjective allegations and "built the logical bridge" from his recitation of Melisa's testimony about her activities to limiting her to sedentary work with additional limitations. For this reason and the other reasons cited above, the court **OVERRULES** Melisa's objection that that ALJ did not properly consider her subjective allegations of impairment.

### V. Conclusion

For the reasons stated, the court finds no error in the magistrate judge's conclusion that the ALJ decision is supported by substantial evidence. As such, the magistrate judge's report and recommendation will be adopted in its entirety.

An appropriate Order will be entered.

It is so **ORDERED**.

Entered:   September 22, 2021

Michael F. Urbanski
Chief U.S. District Judge
2021.09.22 13:57:24
-04'00'

Michael F. Urbanski
Chief United States District Judge